IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TIFFANIE WILLIAMSON, | : | |
| | : | |
| **Plaintiff,** | : | Case No. 2:23-cv-03518 |
| | : | |
| v. | : | Judge Algenon L. Marbley |
| | : | |
| FAIRLFIELD COUNTY BOARD OF | : | Magistrate Judge Kimberly A. Jolson |
| COMMISIONERS, *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

**OPINION & ORDER**

This matter is before this Court on Defendants' Motion for Summary Judgment. (ECF No. 19). For the reasons set forth below, this Court **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 19), **DENIES** Plaintiff's Motion for Leave to file a Sur-Reply (ECF No. 32), and **DENIES as MOOT** Defendants' Motion to Strike (ECF No. 31).

## I.    BACKGROUND

### A.  Factual Background

On October 21, 2021, Jerry Cheesman ("Mr. Cheesman" or "Cheesman") was booked into the Fairfield County Jail for the second time in a month. (ECF No. 19 at 4). Mr. Cheeseman had struggled with addiction for many years and was a "frequent flyer" at the Fairfield County Jail. (ECF No. 1 at 4). The guards were very familiar with Cheesman and aware of the mental health and addiction issues that plagued him. (*Id.*).

Mr. Cheeseman first arrived at the Fairfield County Jail on September 23, 2021, for a probation violation. (ECF No. 19 at 4). He remained at the jail until October 19, 2021, when he was released to go to the Mended Reeds mental health facility in Ironton, Ohio. (*Id.*; ECF No. 19-1, Reed Declaration, at 2). After only two days at Mended Reeds, Cheesman was kicked out of the

1

facility for having Wellbutrin pills in his shoe. (ECF Nos. 28 at 7; 19 at 4). He was then sent back to the Fairfield County Jail on October 19, 2021. Upon arrival, Cheesman was placed in a "turtle suit" which is designed for individuals who are suspected to be suicidal. (ECF No. 1 at 4).

Subsequently, on October 22, 2021, after displaying signs of a mental health crisis, Mr. Cheesman was moved to suicide watch by Deputy David Weiland and Officer Kyle Smith. (ECF No. 28 at 7). The officers noted that Cheesman was screaming in his cell. (ECF No. 19 at 5). Further, the jail staff requested that a mental health technician evaluate Cheesman. (*Id.*). Shannon Lawson, a crisis intervention specialist and licensed social worker at New Horizons Mental Health Services, evaluated Cheesman for 45 minutes. Lawson concluded that Cheesman was suffering from religious delusions and would benefit from a medication evaluation. Lawson also noted that Cheesman "[was] safe and denie[d] SI [suicidal ideation]. (*Id.*). As a result, Cheesman was released to C-115 which is a lockdown unit that houses inmates. (ECF No. 28 at 9).

Cheesman was initially placed with a cellmate in C-115. After Cheesman displayed erratic behavior, however, the cellmate was removed, and Cheesman remained in the cell alone. (*Id.* at 10). It is alleged that Cheesman repeatedly informed guards during this period that he no longer desired to live. (*Id.*). Additionally, pursuant to Lawson's recommendation, Mr. Cheesman was restarted on Celexa/Citalopram and Quetiapine. (ECF No. 19-1, Reed Declaration, at 4). Cheesman reportedly took these medications without difficulty. (*Id.*).

It is further alleged that on October 24, 2021, Cheesman had multiple outbursts and was uncooperative with jail staff. (ECF No. 28 at 10). He refused to lock down and various corrections officers and deputies had to wrangle him back into his cell. (*Id.*). During this encounter, inmates reported that Cheesman's head allegedly hit the stairs and officers ignored his cries for help and statements that he was going to kill himself. (*Id.*; 19-1, Prosecuting Attorney Letter, at 2). The next

2

day Cheeseman allegedly also used the intercom to try to communicate for help and stated that he "wasn't right." (ECF No. 28 at 10). Fairfield County Prosecuting Attorney, R. Kyle Witt ("Witt"), notes in his September 19, 2022, letter that these allegations from inmates were investigated by the Ohio Bureaus of Criminal Investigations ("BCI"), and stated in relevant part:

> There is no sign that the deputies were overly aggressive in their handling of Mr. Cheesman, nor is there any indication that any deputy struck, assaulted, or otherwise intentionally harmed him. Specifically, there is no visual evidence that Mr. Cheesman's head "banged" off the stairs at any point in time. There is likewise no evidence that Mr. Cheesman was violent, although a reasonable person watching the video would likely conclude that he was being intentionally obstinate with deputies when he went limp and forced them to carry him upstairs.

(ECF No. 19-1, Prosecuting Attorney Letter, at 3).

Also on October 25, 2021, Cheesman had his last interaction with Defendant Officer Kyle Smith. (ECF No. 19 at 5). It is alleged that Officer Smith walked by Cheesman's cell between 3:00 p.m. and 3:30 p.m. that afternoon and Mr. Cheesman asked Officer Smith for toilet paper. (*Id.* at 6). Officer Smith retrieved the toilet paper for Cheesman and handed it to him. (*Id.*). Officer Smith attests that at no time between October 21 and October 25, 2021, did Mr. Cheesman express any threats of self-harm or suicidal ideation to him. (*Id.*). Oppositely, BCI investigators were told by inmate, Isaac Browning, that he witnessed Cheesman ask jail staff if he could commit himself to a mental hospital on October 25, 2021. (ECF No. 19-1, Prosecuting Attorney Letter, at 3). Browning allegedly reported that this interaction would have been captured on video visitation footage. (*Id.*). According to Witt's Letter, in the video footage,[1] Cheesman can be overheard having an exchange with an unidentified individual stating:

> "Can I commit myself to the hospital?"
> "Pretty sure I can commit myself to a state mental hospital"

---

[1] This Court only received a video recording of this footage and did not receive the accompanying audio. As a result, this Court was unable to independently verify the statements made by Mr. Cheesman. This Court is only aware of the alleged audio contents via Defendants' Exhibit C – Prosecuting Attorney Letter and the parties' briefs. (See ECF Nos. 19-1, Prosecuting Attorney Letter, at 3; 19 at 6; 28 at 9).

3

"I want to commit myself to a hospital."

(*Id.*). Witt notes that while it is unclear who Cheesman is speaking with, for purposes of his investigation, he presumed the individual to be a deputy. (ECF No. 19-1, Prosecuting Attorney Letter, at 3). Further, when asked about this interaction, Officer Smith attested that he only remembered Cheesman requesting toilet paper during the exchange and would have gotten Cheesman checked if he had asked. (*Id.*). Officer Smith did not work on October 26, 2021. (*Id.*).

On the morning of October 26, 2021, Cheesman was checked on by Deputy James Guseman at 8: 33 a.m. and again at 9:33 a.m. (*Id.* at 7). The Fairfield County Jail's policy is that personal observation checks on inmates are to occur every 60 minutes. (*Id.*). When Deputy Guseman returned for a third check on Cheesman at 10:26 a.m., he observed Cheesman hanging in his cell with a blanket tied around his neck. (ECF No. 1 at 5). Deputy Guseman and other jail staff members rendered aid until the paramedics arrived at 10:36 a.m. (ECF No. 19 at 7). Cheesman was pronounced dead at 11:02 a.m. (ECF No. 28 at 11).

Following the incident, Sheriff Lape had BCI investigate Cheesman's death. (ECF No. 28 at 7). After reviewing the investigation, Witt, the Fairfield County Prosecutor, declined to bring charges against any person. (*Id.*).

### B.  Procedural History

On October 23, 2023, Tiffanie Williamson, Mr. Cheesman's wife, filed a complaint against the Fairfield County Board of Commissioners, Sheriff Lape, and Kyle Smith alleging deliberate indifference under 42 U.S.C. § 1983, wrongful death under O.R.C. §2125.02, and loss of consortium. (ECF No. 1). On May 29, 2025, Defendants filed a Motion for Summary Judgment asserting that: (1) Defendants Smith and Lape are entitled to qualified immunity; (2) Williamson's Monell claims are insufficient; and (3) Williamson's state-law claims are barred by Ohio statutory

immunity. (ECF No. 19). The parties have since completed summary judgment briefing. (ECF Nos. 28, 29). Subsequently, on July 30, 2025, Williamson filed a reply brief without leave of court. (ECF No. 30). As a result, Defendants filed a Motion to Strike the additional reply. (ECF No. 31). Williamson then filed a Motion for Leave to File a Sur-Reply which Defendants oppose. (ECF Nos. 31, 32). These motions are now ripe for this Court's review.

## II. STANDARD OF REVIEW

### A. Motion for Leave to File Sur-Reply

Generally, sur-replies are "highly disfavored, as they usually are a strategic effort by the nonmoving party to have the last word on a matter." *Liberty Legal Found. v. Nat'l Democratic Party of the USA, Inc.*, 875 F. Supp. 2d 791, 797 (W.D. Tenn. 2012) (citation omitted). Further, the Federal Rules of Civil Procedure do not contemplate the filing of sur-replies. This Court's Local Civil Rules permit additional memoranda only "upon leave of court for good cause shown." S.D. Ohio Civ. R. 7.2(a)(2). While the Rules do not define good cause, the Sixth Circuit has noted that additional filings "may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a non-movant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cnty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003)). Even so, courts in the Southern District have permitted parties to file sur-replies without showing good cause when it did not result in prejudice toward the opposing party. *See Nat'l City Bank v. Aronson*, 474 F. Supp. 2d 925, 930 (S.D. Ohio 2007).

### B. Motion for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled

5

to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson, 477 U.S. at 251–52*). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson, 477 U.S. at 251; Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

### III. ANALYSIS

#### A. Motion for Leave to File Sur-Reply

As mentioned above, Plaintiff Tiffanie Williamson filed a reply without leave of court. (ECF No. 30). As a result, Defendants filed a Motion to Strike the additional reply. (ECF No. 31).

6

Williamson then filed a Motion for Leave to File a Sur-Reply which Defendants oppose. (ECF Nos. 31, 32). In support of the Motion for Leave to File a Sur-Reply, Williamson asserts that the reply addresses multiple accusations made by Defendants and it is in the interest of justice for this Court to allow a reply. (ECF No. 32). Williamson primarily argues that there is no basis for Defendants arguments that Williamson did not conduct any discovery given that the statements relied on by Williamson are statements included in the BCI investigation submitted by Defendants. (*Id.* at 1–2). This Court is well equipped to interpret the Federal Rules on the appropriateness of information relied on in summary judgment motions. Moreover, in the reply brief, Williamson does no more than restate the facts already discussed in the opposition motion. Thus, allowing a sur-reply would not be of service to this Court and would only allow Williamson to get the last word. *See Spitzer Autoworld Akron, LLC v. FCA US LLC*, 2023 WL 4842669, at \*1 (N.D. Ohio Feb. 8, 2023). Accordingly, Williamson's Motion for Leave to File Sur-Reply (ECF No. 32) is **DENIED**. Defendants' Motion to Strike (ECF No. 31) is **DENIED as MOOT**.

### B.  Defendants' Motion for Summary Judgment

### 1.  Deliberate Indifference to a Serious Medical Need

Under § 1983 a plaintiff must establish: (1) a person; (2) acting under the color of state law; (3) deprived him or her of rights secured by the United States Constitution and laws. *Waters v. City of Morristown,* 242 F.3d 353, 358–59 (6th Cir. 2001). While § 1983 does not itself create substantive rights, it offers a mechanism under which plaintiffs may remedy deprivations of established constitutional rights. *Oklahoma City v. Tuttle,* 471 U.S. 808, 816 (1985).

Williamson brings a § 1983 action against Officer Kyle Smith alleging that he was deliberately indifferent to the medical needs of Cheesman. Williamson also alleges that Sheriff Lape and Fairfield County failed to train adequately and supervise the corrections officers and staff

7

to care for inmates suffering from mental health issues. (ECF No. 1 at 8). Williamson additionally argues the customs and policies at the Fairfield County Jail were inadequate and ultimately were the moving force behind the deprivations suffered by Mr. Cheesman. (*Id.*).

As a threshold matter, the parties dispute which deliberate indifference standard must be applied here. Historically, courts in this circuit applied a two-part test derived from *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A plaintiff bringing a deliberate indifference claim had to demonstrate under the objective component that there was "a sufficiently serious medical need," and under the subjective component, that "the official kn[ew] of and disregard[ed] an excessive risk...to health or safety." *Id.* at 834, 837. In 2021, however, the Sixth Circuit applied the United States Supreme Court's reasoning in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), that eliminated the subjective component from excessive force claims in the context of deliberate indifference claims. *See Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585, 591–597 (6th Cir. 2021). In *Brawner*, the Sixth Circuit held that under the subjective component, "[a] pretrial detainee must prove 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id.* at 596 (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

Since the Sixth Circuit's decision in *Brawner*, there has been extensive discourse and conflicting decisions within the circuit regarding how *Brawner* has impacted the pretrial detainee deliberate indifference analysis. *See Trozzi v. Lake Cnty., Oh.*, 29 F.4th 745, 757–758 (6th Cir. 2022) (holding that *Brawner* only modified the subjective prong and still requires courts to consider an official's personal knowledge); *Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305, 316–317 (6th Cir. 2023) (declining to follow *Trozzi* and holding that *Brawner*, which intended to lower the subjective component from actual knowledge to recklessness, controls). Current Sixth Circuit

8

case law, as established in *Helphenstine*, supports that the *Brawner* not *Trozzi* controls and as such, a plaintiff must demonstrate that an official "acted deliberately (not accidentally), [and] also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Helphenstine*, 60 F.4th at 316–317 (internal citations omitted).

Additionally in 2024, the Sixth Circuit reasoned that the recent cases that departed from the *Farmer* test were decided between 2021 and 2023. *See Lawler as next friend of Lawler v. Hardeman Cnty., Tennessee*, 93 F.4th 919, 927 (6th Cir. 2024). As such, for the purposes of qualified immunity, the current law for the pretrial detainee deliberate indifference analysis was not "clearly established" for actions that occurred *before Brawner* was decided. *Id.* Put simply, *Lawler* declared that the *Brawner* reckless disregard standard only applies to actions that occurred after September 22, 2021. "But the 'inquiry into whether a pretrial detainee has raised a viable deliberate indifference claim is distinct from the analysis of whether a defendant violated clearly established law for purposes of qualified immunity.'" *See Cole v. Ashtabula Cnty.*, 2025 WL 3562581, at *8 (N.D. Ohio Dec. 12, 2025) (quoting *Hulon v. City of Lansing, Michigan*, 2025 WL 817492, at *8 n.1 (6th Cir. Mar. 14, 2025) (Stranch, J., dissenting)). Thus, courts should assess the substantive component for the purposes of deliberate indifference under *Brawner* regardless of when the incident occurred. *Id.*

Defendants argue that because the issue of the new deliberate indifference framework was not "clearly established" until the *Helphenstine* decision in 2023, this Court must apply the *Farmer* test and require that the officials involved have actual knowledge for the subjective component. (ECF Nos. 19 at 9–10; 29 at 4–5). Williamson retorts that given the events of this case occurred on October 26, 2021, a month after *Brawner* was decided, this Court must apply the *Brawner*

standard requiring a lesser standard of reckless disregard. (ECF No. 28 at 11–12). This Court agrees that *Brawner* controls.

This Court acknowledges that *Lawler* stated that the cases causing the Sixth Circuit to depart from *Farmer* were decided "between 2021 and 2023." *Lawler*, 93 F.4th at 927. Despite such language, this Court does not interpret *Lawler's* holding to mean the law was only clearly established after *Helphenstine* clarified *Brawner* in 2023. Various courts in this circuit, including the Sixth Circuit itself, have since interpreted *Lawler's* holding to mean that the law became clearly established, at the earliest, after *Brawner* was decided. *See Little v. City of Morristown, Tennessee,* 2024 WL 1530468, at *3 (6th Cir. Apr. 9, 2024) ("In *Lawler*, we held that pretrial detainees' right to be free from reckless, rather than knowing, disregard to a serious risk of harm was not clearly established until, at the earliest, *Brawner's* publication in 2021."); *Montgomery v. Med.*, 2024 WL 3548471, at *9 (M.D. Tenn. May 30, 2024), *report and recommendation adopted sub nom. Montgomery v. Wellpath Med.*, 2024 WL 3544572 (M.D. Tenn. July 24, 2024) ("The Sixth Circuit recently held that a pretrial detainee's right to be free from reckless—not knowing— disregard to a serious risk of harm was not clearly established until, at the earliest, *Brawner's* publication on September 21, 2021.").

Additionally, the actions at issue in *Lawler* occurred well before 2021 and the *Brawner* decision. As a result, the *Lawler* court had no issue establishing that *Farmer* was the proper test to apply in that specific case. Here, the events leading to Mr. Cheesman's death occurred between October 21 and October 26, 2021, a month *after Brawner* was decided. Specifically, the events here occurred after *Brawner*, but before *Trozzi* sought to modify *Brawner*, and before *Helphenstine* clarified that *Brawner,* not *Trozzi,* controls the analysis. In light of this history, this Court is not compelled by the Defendants' argument that *Farmer* must apply. At the time of the relevant events

10

in this case, *Brawner* was decided and controlled. *Helphenstine* did not change the *Brawner* test but invalidated the attempts of *Trozzi* to alter *Brawner's* holding. And, as discussed above, there is a difference between whether a plaintiff raises an adequate deliberate indifference claim, versus whether the law was clearly established for the purposes of qualified immunity. *Hulon*, 2025 WL 817492, at *8 n.1 (Stranch, J., dissenting). Even so, this Court finds that the *Brawner* standard would apply to the qualified immunity analysis in this case as well. *Cf. Gibson v. Champlin*, 2024 WL 3877529, at *7 (S.D. Ohio Aug. 20, 2024) ("[F]or actions arising before *Brawner* was decided in 2021, a court must apply the higher actual-knowledge standard from *Farmer* to determine if an officer is entitled to qualified immunity."). Thus, given, the conduct at issue occurred after September 22, 2021, this Court will apply *Brawner* to the subjective component analysis. *See Cole*, 2025 WL 3562581, at *8 (applying *Brawner* to an incident that occurred post *Brawner* but before *Helphenstine*).

Thus, this Court must evaluate Williamson's deliberate indifference claims by determining whether: (1) Mr. Cheesman had a sufficiently serious medical need; and (2) whether each defendant acted deliberately (not accidentally), and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. *See Helphenstine*, 60 F.4th at 317 (quoting *Brawner*, 14 F.4th at 596).

### a) Objective Component

A medical need is sufficiently serious if "a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004) (citation omitted). Moreover, a "condition resulting in death" generally suffices. *Howell v. NaphCare*, Inc., 67 F.4th 302, 311–312 (6th Cir. 2023). In the context of prison suicide, however, the medical need is sufficiently serious when the detainee is displaying suicidal tendencies with "a

11

strong likelihood that he would attempt to take his own life." *See Mantell v. Health Professionals Ltd.*, 612 F. App'x 302, 306 (6th Cir. 2015) (citing *Gray v. City of Detroit,* 399 F.3d 612, 616 (6th Cir. 2005); *see also Campbell v. Riahi,* 2023 WL 5979211, at *4 (S.D. Ohio Sept. 13, 2023), *aff'd,* 109 F.4th 854 (6th Cir. 2024). Further, merely showing a detainee at one point *had* suicidal tendencies does not equate to establishing a serious medical need. *Campbell,* 2023 WL 5979211, at *4.

As support for the objective component, Williamson argues that the Defendants were aware of Mr. Cheesman's previous suicidal ideations and that he had been placed on suicide watch multiple times before his death. Williamson also highlights that Cheesman was displaying concerning behavior that placed him on suicide watch, and he orally stated multiple times that he wanted to harm himself. (ECF No. 28 at 18–19). The Defendants, however, do not explicitly refute that Mr. Cheesman suffered from a sufficiently serious medical need. Rather, the Defendants contend that the crux of the analysis in prison cases hinges on the subjective component. (ECF No. 19 at 9–11). Thus, this Court "will assume without deciding that [Mr. Cheesman's] psychological needs manifested themselves in suicidal tendencies with 'a strong likelihood that he would attempt to take his own life.'" *Mantell*, 612 F. App'x at 306 (citing *Gray,* 399 F.3d at 616); *see also Batton v. Sandusky Cnty., Ohio*, 2024 WL 1480522, at *4 (6th Cir. Apr. 5, 2024) (affirming the district court's decision to assume without deciding that the detainee's suicidal tendencies were sufficiently serious where the parties did not focus on the objective component). The objective component, therefore, has been satisfied.

### b) Subjective Component

### (1) Officer Kyle Smith

Next, this Court must evaluate whether each defendant individually knew or should have known of an unjustifiably high risk of harm to Mr. Cheesman, and whether they acted deliberately and recklessly in the face of the risk. *Helphenstine*, 60 F.4th at 317. This Court will first evaluate Officer Smith. Williamson contends that the Defendants failed to act on Mr. Cheesman's blatant signs of suicidal ideation expressed through statements threatening to kill himself. (ECF No. 28 at 14–15). In Williamson's view, the jail staff should have placed Mr. Cheesman on suicide watch, ensured he had a cellmate, and had him evaluated by a true medical professional. (*Id.*). As for Officer Smith specifically, Williamson contends that he interacted with Cheesman on October 25, 2021, when he delivered toilet paper to Cheesman. (ECF No. 28 at 24). Williamson also points out that multiple inmate witnesses gave statements specifically mentioning Officer Smith and stating that Mr. Cheesman's pleas for help were ignored. (*Id.* at 10, 24).

Defendants counter that Willaimson must prove liability to each particular defendant and may not impute knowledge from one defendant to another. (ECF No. 19 at 3). In the Defendants' view, Williamson cites only two interactions between Officer Smith and Cheesman. First, on October 22, 2021, when Officer Smith removed Cheesman from his cell and sought mental health attention for him, and second, on October 25, 2021, during the interaction in which Officer Smith retrieved toilet paper for Cheesman. (*Id.* at 5). The Defendants contend that during the first interaction, Officer Smith was nothing less than diligent in seeking mental health intervention for Mr. Cheesman. Moreover, in the final interaction, Defendants argue that there is no evidence in the record supporting the fact that Officer Smith heard statements from Mr. Cheesman asking whether he could commit himself to a mental health hospital. But even if he had heard, such statements do not constitute conduct in which Officer Smith acted recklessly in the face of an

13

unjustifiably high risk of harm that is either known or so obvious that it should be known. (*Id.* at 6). This Court agrees.

First, in order to analyze the subjective prong adequately, this Court must address the subjective component as to each defendant individually. *Greene v. Crawford Cnty., Michigan*, 22 F.4th 593, 607 (6th Cir. 2022). [2] Officer Smith was undeniably aware that Cheesman suffered from alcoholism, had a history of mental health issues, and had just been released from suicide watch, given that Officer Smith was the one who arranged for him to be seen by the mental health professional. Officer Smith was also undoubtedly aware that a mental health specialist had cleared Mr. Cheesman and determined he was not suffering from suicidal ideations four days before his death. In light of these facts, this Court cannot declare that Officer Smith acted recklessly in the face of an obvious and unjustifiably high risk where he relied on the analysis of a mental health specialist. *See Hehrer v. Cnty. of Clinton, Michigan*, 161 F.4th 955, 964 (6th Cir. 2025) ("[O]nce inmates begin to receive care from a medical professional, officers typically act reasonably by following the medical professional's diagnosis or treatment.") (internal quotation marks omitted). Nor is there any evidence in the record demonstrating that Cheesman's behavior had deteriorated since his initial consultation with the mental health specialist to the extent that Officer Smith was put on notice that he needed additional intervention. *See Greene*, 22 F.4th at 608–609 (finding the need for additional medical attention to be obvious where hours following the initial mental health assessment the detainee had begun to suffer from severe hallucinations and did not sleep for over 24 hours); *Barberick v. Hilmer*, 727 F. App'x 160, 163–64 (6th Cir. 2018) ("[A]n officer who seeks out the opinion of a doctor is generally entitled to rely on a reasonably specific medical

---

[2] This Court notes that Williamson repeatedly refers to the Defendants collectively, despite the requirement that subjective component be applied on an individual basis, making it difficult for this Court to assess arguments for each individual Defendant's subjective liability.

opinion for a reasonable period of time after it is issued, absent circumstances such as the onset of new and alarming symptoms[.]"). Even if this Court were to consider the statements provided by various inmates to BCI investigators regarding the incident where Cheesman refused to lockdown and was forcefully dragged to his cell, such evidence is not sufficient to demonstrate Officer Smith should have been aware of a need for further intervention. There is no evidence in the record that Officer Smith was involved in this incident, and further, Witt's letter attests that video evidence did not corroborate that the deputies were overly aggressive with Cheesman. (ECF No. 19-1, Prosecuting Attorney Letter, at 3).

This Court is also unconvinced by Williamson's contentions that the Defendants failed to secure an "actual medical opinion." (*See* ECF No. 28 at 18). Lawson is a licensed social worker and crisis intervention specialist. (ECF No. 19 at 11). Williamson cites no case law to support that a licensed social worker is not qualified to assess the suicidal risks of inmates or that an officer's reliance on a social worker's assessment is unreasonable. In fact, it is common and acceptable for jail staff to refer inmates to licensed social workers when they demonstrate concerning behaviors. *See Andrews v. Wayne Cnty.*, *Michigan*, 957 F.3d 714, 724 (6th Cir. 2020) (holding that a county employee was not deliberately indifferent in part because he referred the detainee to a social worker for evaluation); *Campbell*, 2023 WL 5979211, at *2, 7 ( finding no deliberate indifference where the officer relied on the evaluation of a licensed social worker). Additionally, there is no evidence to support that Lawson was unethical or had a history of mistreating inmates. *Hehrer*, 161 F.4th at 964 ("[A]n officer might act recklessly if the officer defers to an unethical healthcare worker that the officer knows mistreats inmates."). Thus, Officer Smith acted reasonably in relying on Lawson's assessment of Mr. Cheesman.

15

Most devastating to her claims is that Williamson fails to offer concrete evidence that could lead this Court to conclude there is a genuine issue of material fact regarding Officer Smith under the subjective component. Williamson contends that this Court should rely on statements from various inmates from the BCI interviews to conclude that Officer Smith heard Mr. Cheesman's cries for help, statements of self-harm, and witnessed him suffering from withdrawal, yet ignored these obvious warning signs. (ECF No. 28 at 9–11, 20, 24). As the Defendants point out, Williamson conducted no discovery in this case. Instead, Williamson relies on the unsworn statements of inmates that were collected during the BCI investigation for this incident and submitted in the exhibits attached to the Defendants' motion for summary judgment. While this Court acknowledges that such exhibits have been submitted as part of the record, such statements are insufficient to create a genuine dispute of material fact. *Beans v. City of Massillon*, 2016 WL 7492503, at *6 (N.D. Ohio Dec. 30, 2016), *aff'd,* 706 F. App'x. 295 (6th Cir. 2017) ("The fact that the unsworn transcripts were produced during discovery does not cure the fact that they contain inadmissible hearsay."); *see also Wright v. Baker*, 849 F. Supp. 569, 572 (N.D. Ohio 1994) ("[U]nsworn statements and affidavits composed of hearsay and non-expert opinion evidence, 'do not satisfy Rule 56(e) and must be disregarded.'") (citation omitted). Even though these statements were retrieved during the BCI investigation, these witnesses were never deposed, and as such, this Court may not construe these statements as "competent evidence" when reviewing summary judgment. *Beans*, 2016 WL 7492503, at *6 (quoting *Pollino v. City of Phila.*, 2005 WL 372105, at *7 (E.D. Pa. Feb. 15, 2005)).

Even if this Court could rely on the unsworn statements of the inmates, Sixth Circuit precedent does not support that the alleged suicidal statements and erratic behavior described by the inmates was enough to put Officer Smith on notice that there was a strong likelihood that Mr.

16

Cheesman would commit suicide. *Batton*, 2024 WL 1480522, at \*4 ("[D]espondency paired with other stressors like drug withdrawal or even threats of suicide may not demonstrate a strong likelihood of suicide when the detainee's other conduct or statements indicate that he is not suicidal."); *see also Nallani v. Wayne Cnty.*, 665 F. App'x 498, 507–08 (6th Cir. 2016) (detainee's previous suicidal statements, history of suicide, suicidal feelings at the time of arrest, and known failure to take medication did not create strong likelihood where detainee otherwise denied being suicidal).

In light of these facts, this Court cannot conclude that Officer Smith acted unreasonably or recklessly in light of an obvious and unjustifiably high risk of harm. Thus, Williamson has failed to satisfy the subjective component. Officer Smith was not deliberately indifferent.

### (2)    Sheriff Lape

In order to succeed on a supervisory liability claim, "a plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021). Ultimately, however, if "a plaintiff cannot establish that a subordinate engaged in unconstitutional conduct, any attempt to impose supervisory liability must fail." *Young v. Campbell Cnty., Kentucky*, 846 F. App'x 314, 324 (6th Cir. 2021). Willaimson argues that Sheriff Lape was the acting sheriff and therefore "at least implicitly authorized" the way suicide watch was implemented in practice. (ECF No. 28 at 24). The Defendants point out that Sheriff Lape had no personal involvement in the incident and that Williamson conflates supervisory liability with municipal liability. (ECF No. 19 at 13). This Court finds that because Williamson failed to show that Officer Smith acted with deliberate indifference, she cannot succeed on a supervisory liability claim against Sheriff Lape.

17

### c)      Qualified Immunity

The qualified-immunity doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The plaintiff bears the burden to show that a defendant is not entitled to qualified immunity. *O'Malley v. City of Flint*, 651 F.3d 662, 667 (6th Cir. 2011). Given this Court has established that Williamson failed to establish a constitutional violation occurred, this Court need not delve further into the issue of whether the deliberate indifference law was clearly established. As such, both Officer Smith and Sheriff Lape are entitled to qualified immunity.

### 2.      *Monell* Claims

A municipality may be liable under § 1983 if the municipality itself caused the alleged deprivation. *Solis v. City of Columbus*, 319 F. Supp. 2d 797, 802 (S.D. Ohio 2004) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 691–94 (1978)). A plaintiff can demonstrate municipal liability by demonstrating that the municipality maintained a policy or custom that was the "moving force" behind the constitutional violation. A municipality may not be held liable under a theory of respondeat superior. *Id.* That said, "where there has been no showing of individual constitutional violations on the part of the officers involved, there can be no municipal liability." *Baker v. City of Trenton,* 936 F.3d 523, 535 (6th Cir. 2019). As such, without an underlying constitutional violation, Williamson cannot succeed on her *Monell* claim against Fairfield County.

### 3.      State Law Claims

18

Finally, Williamson brings claims under Ohio law against Defendants for wrongful death and loss of consortium. (ECF No. 1 at 8). "When federal qualified immunity and Ohio state-law immunity under § 2744.03(A)(6) rest on the same questions of material fact, [a court] may review the state-law immunity defense 'through the lens of the federal qualified immunity analysis.'" *Hopper v. Phil Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1 (6th Cir. 2009)). As established above, because the Defendants did not violate a constitutional right and are entitled to qualified immunity, the Defendants are also entitled to Ohio statutory immunity for all state-law claims. *See Cole,* 2025 WL 3562581, at *14 (holding defendants were entitled to statutory immunity where they were entitled to federal qualified immunity); *Campbell*, 2023 WL 5979211, at *8 (holding defendants were entitled to Ohio statutory immunity for deliberate indifference claims where they were found to not have acted with deliberate indifference under federal law).

### IV.    CONCLUSION

Accordingly, this Court **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 19) and **DISMISSES** Williamson's Complaint (ECF No. 1) **WITH PREJUDICE**. In addition, this Court **DENIES** Plaintiff's Motion for Leave to file a Sur-Reply (ECF No. 32) and **DENIES AS MOOT** the Defendants' Motion to Strike (ECF No. 31).  This case is now **CLOSED**.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: March 31, 2026**

19